_____ FILED        _____ ENTERED
_____ LODGED       _____ RECEIVED

**APR 22 2019**

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY      WESTERN DISTRICT OF WASHINGTON
                                    DEPUTY

Hon. Thomas S. Zilly

**RECEIVED**

**APR 23 2019**

**IN SEATTLE**

**CASE FILED UNDER SEAL**
pursuant to 31 U.S.C. § 3730(b)(2)
and LCR 5(g)(2)(A)

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| [UNDER SEAL],<br><br>   *Plaintiffs,*<br><br> v.<br><br>[UNDER SEAL],<br><br>   *Defendants.* | No. 2:19-cv-00404-TSZ *SEALED*<br><br>FIRST AMENDED COMPLAINT<br><br>JURY DEMAND |

DOCUMENT TO BE KEPT UNDER SEAL

DO NOT ENTER INTO PACER

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–1–

ROBERT McGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA 98104-2205
Tel/Fax: 253-267-8530

593162.1

1

Hon. Thomas S. Zilly

2

3

4

5

6

7          **CASE FILED UNDER SEAL**
          pursuant to 31 U.S.C. § 3730(b)(2)
8                    and LCR 5(g)(2)(A)

9

10

11          **UNITED STATES DISTRICT COURT**
          **WESTERN DISTRICT OF WASHINGTON**
12                    **AT SEATTLE**

13  | UNITED STATES OF AMERICA, the States | No. 2:19-cv-00404-TSZ *SEALED* |
   of ALASKA, IOWA, MARYLAND,
14  MINNESOTA, MONTANA, and
   WASHINGTON,                             FIRST AMENDED COMPLAINT
15
                                           JURY DEMAND
16  ex. rel. KAREN RAWLINS,

17              *Plaintiffs,*

18          v.

19  IDEAL OPTION PLLC, DR. JEFFREY
   ALLGAIER, DR. KENNETH EGLI,
20
21              *Defendants.*

22          *Qui Tam* Plaintiff and Relator Karen Rawlins ("Relator"), through her attorneys Phillips &

23  Cohen LLP, and on behalf of the United States of America ("United States" or the "Government),

24  the Plaintiff-States of Alaska, Iowa, Maryland, Minnesota, Montana, and Washington for their

25  complaint against Defendants Ideal Option PLLC, Dr. Jeffrey Allgaier, and Dr. Kenneth Egli

26  ("Defendants") alleges, based upon personal knowledge, relevant documents, and information and

27  belief, as follows:

1ST AM. COMPL. – QUI TAM ACTION          –2–          ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                        113 Cherry Street PMB 86685
                                                      Seattle, WA 98104-2205
                                                      Tel/Fax: 253-267-8530

593162.1

I.  **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America, the States of Alaska, Iowa, Maryland, Minnesota, Montana, and Washington arising from false and/or fraudulent claims caused to be made by Defendant and/or its agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("the Act" or "FCA"); the state false claims statutes of Alaska, Alaska Stat. Ann. § 09.58.010 *et seq.*; Iowa, Iowa Code § 685.1 *et seq.*; Maryland, Md. Health Gen. Code § 2-601 *et seq.*; Minnesota, Minn. Stat. § 15C.01 *et seq.*; Montana, Mont. Code Ann. § 17-8-401 *et seq.*; and Washington, Rev. Code Wash. (RCW) § 74.66.005 *et seq.*

2.      The federal False Claims Act was originally enacted during the Civil War.  In 1986, after finding that fraud in federal programs was pervasive and that the FCA was in need of modernization, Congress substantially amended the FCA to enhance the ability of the United States Government to recover losses sustained due to fraud against it.  The FCA allows any person with information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  The FCA requires the Complaint to be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

3.      Since at least 2017, and continuing to date, Defendants have knowingly submitted false or fraudulent claims for reimbursement to Medicaid and Medicare, including for medically unnecessary urine drug tests.  Defendants also operated their Office-Based Opioid Treatment Program in violation of the Controlled Substances Act by causing its providers to prescribe a controlled substance, buprenorphine, in excess of the allowable limits of providers' buprenorphine waivers.  Defendants submitted claims for patient visits to Medicaid and Medicare despite operating in violation of the Controlled Substances Act.  Overall, Defendants have received millions of dollars each year in wrongful reimbursement from Medicaid, Medicare and other government payors.

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*                    –3–                    ROBERT MCGUIRE LAW FIRM
                                                                        113 Cherry Street PMB 86685
                                                                        Seattle, WA  98104-2205
                                                                        Tel/Fax: 253-267-8530

593162.1

4.     Defendants' conduct violates the federal FCA and analogous state and local statutes. The federal FCA prohibits, among other things, knowingly presenting or causing the presentation of a false or fraudulent claim, and/or knowingly making or causing to be made, a false record or statement material to a false or fraudulent claim for payment or approval to the federal government or to a grantee of the federal government. 31 U.S.C. §§ 3729(a)(1)(A), (B). It also prohibits knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government. *Id.* § 3729(a)(1)(G). Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages the United States sustains. *Id.* § 3729(a)(1). State and local statutes proscribe similar conduct and provide for similar remedies.

5.     Accordingly, *Qui Tam* Plaintiff-Relator seeks to recover all available damages, civil penalties, and other relief for the continuing violations alleged in this Complaint in every jurisdiction to which Defendants' misconduct has extended.

## II.     THE PARTIES

6.     Ideal Option PLLC ("Ideal Option") is an Office-Based Opioid Treatment Program with offices located in Alaska, Idaho, Iowa, Maryland, Minnesota, Montana, Nebraska, North Dakota, Oregon, and Washington state. It offers Medication Assisted Treatment in an office-based treatment setting for those with opioid addiction. Most of Ideal Option's patients are insured by Medicaid. It is headquartered at 8508 W. Gage Boulevard, Unit A101, in Kennewick, Washington state. Dr. Jeffrey Allgaier and Dr. Kenneth Egli founded Ideal Option in 2012. In late 2018, Ideal Option partnered with growth management firm Varsity Healthcare Partners, which invested in Ideal Option to help facilitate Ideal Option's growth. Tim Kilgallon is Ideal Option's CEO.

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–4–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

7.      Ideal Option also owns two clinical laboratories located in the Tri-Cities of Washington state.  These laboratories perform urine drug testing and other lab tests ordered by Ideal Option providers.

8.      Defendant Dr. Jeffrey Allgaier is one of Ideal Option's founders alongside Dr. Kenneth Egli.  Dr. Allgaier is board certified in Emergency Medicine and Addiction Medicine.  Dr. Allgaier resides in Washington state.

9.      Dr. Kenneth Egli founded Ideal Option along with Dr. Allgaier.  He is board certified in Emergency Medicine and Addiction Medicine.  Dr. Egli resides in Washington state.

10.     *Qui Tam* Plaintiff and Relator Karen Rawlins lives and works in Anchorage, Alaska.  Relator began working as a nurse practitioner in Defendant's Anchorage clinic in June 2017.  Most weeks, on two of Relator's four work days, she remotely connects via telemedicine from Ideal Option's Anchorage clinic to its clinics in Washington state.  Relator personally witnessed Defendants' fraudulent practices.

### III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

12.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in, resides, and/or transacts or has transacted business in this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transacts or has transacted business in this District.  At all times relevant to this Complaint, Defendants regularly conducted substantial business, maintained employees, and/or made significant sales in this District.  In addition, statutory violations, as alleged in this Complaint, occurred in this District.

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

IV.    **APPLICABLE LAW**

A.    **The False Claims Act**

14.    The federal False Claims Act (the "FCA") was originally enacted during the Civil War.  After finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization, Congress substantially amended the FCA in 1986 to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.  Congress further substantially amended the FCA in 2009 and 2010 to, among other things, strengthen whistleblowers' ability to bring and maintain actions on the Government's behalf.

15.    The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.  31 U.S.C. §§ 3729(a)(1)(A), (B), (G).  Any person who violates the FCA is liable for a civil penalty of up to $21,563 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

16.    For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that the defendant

specifically intended to commit fraud. *Id.* Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

17.    The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. Such a person is known as a *qui tam* "relator." The FCA requires that the *qui tam* relator's complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

## V.    FEDERAL, STATE, AND CITY HEALTH CARE PROGRAMS

### A.    Medicaid

18.    Medicaid is a public-assistance program created in 1965 that provides payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the federal government and those states participating in the program. Medicaid is the largest source of funding for medical services for America's poor and disabled. Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

19.    Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act and with the regulations the Secretary of HHS promulgates. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

20.    Like Medicare, Medicaid covers medical services only if it is necessary to diagnose or treat a patient's particular medical condition. Medicaid routinely pays for testing and services if they meet those standards. Although Medicaid reimbursement varies depending on the state in which the billing is done, all services provided must meet the medical necessity

1ST AM. COMPL. – QUI TAM ACTION          –7–          ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                                    113 Cherry Street PMB 86685
                                                                                    Seattle, WA  98104-2205
                                                                                    Tel/Fax: 253-267-8530

593162.1

threshold. The federal Medicaid Act does not provide a definition of medical necessity. Instead, each state defines "medical necessity" in its own laws and regulations implementing its Medicaid program.

21. Alaska's Medicaid regulations require that the Department of Health and Social Services will only pay for services that are medically necessary. It will not pay for services are "not reasonably necessary for the diagnosis and treatment of an illness or injury, or for the correction of an organic system, as determined upon review by the department." 7 AAC 105.110(1).

22. Iowa's Medicaid regulations define "medically necessary services" as "those covered services that are, under the terms and conditions of the contract, determined through contractor utilization management to be: 1. Appropriate and necessary for the symptoms, diagnosis or treatment of the condition of the member; 2. Provided for the diagnosis or direct care and treatment of the condition of the member to enable the member to make reasonable progress in treatment; 3. Within standards of professional practice and given at the appropriate time and in the appropriate setting; 4. Not primarily for the convenience of the member, the member's physician or other provider; and 5. The most appropriate level of covered services that can safely be provided." Iowa Admin. Code r. 441-73.1(249A).

23. Maryland's Medicaid regulations define medical necessity to mean that "the service or benefit is: (a) Directly related to diagnostic, preventive, curative, palliative, rehabilitative, or ameliorative treatment of an illness, injury, disability, or health condition; (b) Consistent with current accepted standards of good medical practice; (c) The most cost efficient service that can be provided without sacrificing effectiveness or access to care; and (d) Not primarily for the convenience of the consumer, the consumer's family, or the provider." Md. Code Regs. 10.09.62.01.

24. Minnesota's Medicaid regulations define "Medically necessary care" as "health care services appropriate, in terms of type, frequency, level, setting, and duration, to the

1ST AM. COMPL. – QUI TAM ACTION      –8–
No. 2:19-cv-00404-TSZ *SEALED*

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

enrollee's diagnosis or condition, and diagnostic testing and preventive services" that "must: A. be consistent with generally accepted practice parameters as determined by health care providers in the same or similar general specialty as typically manages the condition, procedure, or treatment at issue; and B. help restore or maintain the enrollee's health; or C. prevent deterioration of the enrollee's condition; or D. prevent the reasonably likely onset of a health problem or detect an incipient problem." Minn. R. 4685.0100.

25.     Montana's Medicaid regulations define "Medically necessary service" to mean "a service or item reimbursable under the Montana Medicaid program, as provided in these rules: (a) Which is reasonably calculated to prevent, diagnose, correct, cure, alleviate, or prevent the worsening of conditions in a patient which: (i) endanger life; (ii) cause suffering or pain; (iii) result in illness or infirmity; (iv) threaten to cause or aggravate a handicap; or (v) cause physical deformity or malfunction." Mont. Admin. R. 37.82.102.

26.     Washington state's Medicaid regulations define "Medically necessary" as a "service which is reasonably calculated to prevent, diagnose, correct, cure, alleviate or prevent worsening of conditions in the client that endanger life, or cause suffering or pain, or result in an illness or infirmity, or threaten to cause or aggravate a handicap, or cause physical deformity or malfunction. There is no other equally effective, more conservative or substantially less costly course of treatment available or suitable for the client requesting the service. For the purposes of this section, 'course of treatment' may include mere observation or, where appropriate, no medical treatment at all." Wash. Admin. Code 182-500-0070.

27.     Providers receiving reimbursement from Medicaid must make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.

**B.      Medicare**

28.     Medicare is a federally funded health-insurance program primarily benefitting the elderly. Congress established the Medicare program, or Title XVIII of the Social Security Act,

1ST AM. COMPL. – QUI TAM ACTION            –9–        ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                               113 Cherry Street PMB 86685
                                                            Seattle, WA  98104-2205
                                                            Tel/Fax: 253-267-8530

593162.1

in 1965 with the goal of providing nationalized health coverage for Americans aged 65 or older. In addition to the elderly, a large portion of Medicare's patient population is disabled. In 2015, Medicare covered roughly 55 million Americans, either through the traditionally federally administered Medicare program or through a private health plan, also known as a Medicare Advantage plan. Medicare is funded through the Medicare Trust Fund, which relies on workers' payroll deductions and government funds.

29.     The United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

30.     Medicare has four parts: Part A, providing hospital insurance; Part B, providing medical insurance, Part C, which includes managed care plans; and Part D, which provides prescription drug benefits.

31.     Section 1862 of the Social Security Act, codified at 41 U.S.C. §1395y(a)(1)(A), explains that under Medicare, "no payment may be made under part A or part B for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the prevention of illness." Medicare reimburses only for the cost of services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

32.     CMS will deny a claim where the service or drug provided is not reasonable and necessary and the necessity is not documented in the medical record. 42 C.F.R. § 410.32(d)(2)(i)-(iii); (d)(3)(ii)-(iii).

33.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

593162.1

## VI.    DEFENDANTS PERFORMS MEDICALLY UNNECESSARY AND EXCESSIVE LABORATORY TESTS

### A.    Defendants Conducts Duplicative Urine Drug Tests on its Patients

34.    Defendant Ideal Option is an Office-Based Opioid Treatment program founded in 2012 with numerous facilities located in ten states: Alaska, Idaho, Iowa, Maryland, Minnesota, Montana, Nebraska, North Dakota, Oregon, and Washington.  Ideal Option offers medication-assisted outpatient treatment for addiction to opioids and other substances.  It also owns two clinical laboratories located in Tri-Cities, Washington.

35.    As part of its treatment program, Ideal Option conducts urine drug testing of its patients, ostensibly to assess patients' compliance with prescribed medication and abuse of other substances.  Ideal Option conducts both qualitative urine drug testing (also referred to as screening or presumptive tests), and quantitative urine drug testing (also referred to as definitive or confirmatory tests).

36.    Ideal Option wrongly increases reimbursement by conducting tests for substances that are not necessary for treatment and by undertaking duplicative and simultaneous qualitative and quantitative testing.  Ideal Option also overutilizes urine drug tests, testing patients more frequently than medically necessary.  It tests patients at every visit—sometimes as frequently as multiple times per week.

37.    Ideal Option also analyzes the duplicative urine drug tests at its own clinical laboratories, and then wrongly bills Medicaid, Medicare, and other insurance payors for reimbursement.

38.    As a result of these practices, Defendants knowingly submit, or causes the submission, of claims for urine drug testing that it knows are duplicative and unnecessary.  Claims for medically unnecessary urine drug tests are not reimbursable under Medicaid and Medicare and constitute false or fraudulent claims under the federal False Claims Act and the analogous false claims laws of the Plaintiff-States.

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

**B.**    **Duplicative and Excessive Urine Drug Tests Are Not Medically Necessary**

39.    Urine drug tests, or "UDTs," are used to assess whether patients are using illicit drugs or taking prescribed drugs properly.  UDTs are often used in substance abuse treatment to manage the risk of addiction by patients prescribed opioid drugs.

40.    There are two levels of complexity in urine drug testing.  The simpler and less expensive first level of testing is qualitative (sometimes called "presumptive") testing.  The second more expensive and complex level of testing is quantitative (sometimes called "definitive") testing.

41.    Qualitative testing is typically the first level of urine drug testing performed.  Qualitative testing only assesses whether particular drugs are present in the patient's urine.  It does not detect the level, or how much of, a particular drug is present.  Qualitative testing is less complex and cheaper to perform than quantitative testing.  It can also detect the presence of multiple drugs using a single analysis, and may either be performed in-office, through a dipstick or urine cup sample, or sent to a laboratory for analysis.

42.    Quantitative testing is a more complex level of testing that may be performed if a result from a qualitative test necessitates further testing.  Quantitative testing measures the amount of drug present in a urine sample, and is more expensive to perform than qualitative testing, in part because a different reagent must be used to test the sample for each drug.  For example, if a provider ordered quantitative testing for cocaine, THC, and heroin, the laboratory would need to test the sample with the three reagents used for those specific drugs.  Quantitative testing is therefore typically undertaken when qualitative test results for specific drugs are flagged as suspicious.

43.    UDTs have been overutilized to generate inflated revenues.  Overutilizing the tests and ordering repeat and duplicative testing at frequent intervals for all patients, and/or patients on whom repeated testing is not medically necessary.

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

44.  In addition to testing more frequently than medically necessary, providers abuse UDTs by ordering both qualitative and quantitative levels of testing simultaneously, instead of waiting for the results of the qualitative test to dictate which quantitative tests should be ordered.  Providers will also abuse UDTs by conducting quantitative testing even when the results of the qualitative test do not necessitate further testing.

45.  These practices lead to the overutilization of laboratory testing, and consequently to improper claims for reimbursement.

46.  Alaska's Department of Health and Social Services, which administers the Alaska Medicaid program, has also published policy clarification on urine drug screening and testing. Under this policy, Alaska Medicaid will "pay for a service only if it is medically necessary" and pay for "*no more than 20* presumptive drug screening (UDS) per calendar year per Medicaid member."  State of Alaska Dep't of Health Social Services, Alaska Medicaid Policy Update, Drug Screening/Testing (Jan. 18, 2018) *available at* http://manuals.medicaidalaska.com/docs/dnld/Update_Drug_Testing_2018.01.01.pdf (emphasis added).  Alaska Medicaid considers quantitative or definitive urine drug testing medically necessary "only when ordered to confirm a positive presumptive drug test, or when a negative result of presumptive test is inconclusive or inconsistent with clinical presentation" and "reimburses for *no more than 20* Definitive drug testing codes (UDS) per calendar year per Medicaid member."  *Id.* (emphasis added).

47.  Maryland's Department of Health, which administers its Medicaid Program, has interpreted its regulations for covered services performed by medical laboratories, COMAR 10.09.09.04, to prohibit definitive testing for over fourteen drug classifications at one time as not medically necessary in substance abuse testing.  *See* Maryland Dep't of Health, Provider Transmittal 09-18, Drug Testing Payment Changes (Nov. 21, 2017) *available at* https://mmcp.health.maryland.gov/MCOupdates/Documents/pt_09-18.pdf.

1ST AM. COMPL. – QUI TAM ACTION          –13–          ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                                113 Cherry Street PMB 86685
                                                             Seattle, WA  98104-2205
                                                             Tel/Fax: 253-267-8530

48.     Minnesota's Department of Human Services' Provider Manual states that Minnesota Health Care Programs, which includes Minnesota's Medicaid program, allows coverage for urine drug testing that is medically necessary.  More specifically, for outpatient pain management or substance abuse settings, presumptive urine drug testing "may be considered medically necessary for the following:

- Baseline screening at the time treatment is initiated: One time per program
- Stabilization phase: Weekly screening for a maximum of four weeks
- Maintenance phase: Screening once every one to three weeks

Presumptive UDT is limited to *15 tests within a 12 month period*.  UDT after the identification of the patient's drugs or use or abuse profile must be limited to the specific drugs present on the initial profile."  Minnesota Dep't of Human Services, Provider Manual, Laboratory and Pathology Services (May 31, 2017) (emphasis added).  Confirmatory drug tests may be considered medically necessary when:

- A screen results in a negative finding that is inconsistent with the patient's medical history, current clinical condition or the patient's own statement
- Presumptive testing is positive
- Providers must document exceptions with the rationale for the confirmation testing order in the medical record

Routine confirmations of drug screens with negative results are not deemed medically necessary and are not covered.  *Id.*

49.     Washington State's Medicaid Billing Guide specifies that for drug screening tests for medication assisted treatment, up to twenty-four presumptive tests will be reimbursed per client per year.  For definitive tests, up to twelve tests will be reimbursed per year.  Presumptive testing for monitoring patients receiving medication assisted treatment is medically necessary when used to confirm the use of prescribed substances, identify the presence of illicit or non-prescribed substances, or prior to starting a patient on medication assisted treatment for substance use disorder.  Definitive testing is considered medically necessary to interpret the findings on presumptive testing when there is a discrepancy between the patient report, the test, and what is being prescribed.  The billing guide notes that "confirmatory testing should only be ordered and performed on a patient/drug specific basis.  Clinical documentation must support why a

1ST AM. COMPL. – QUI TAM ACTION          –14–          ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                                 113 Cherry Street PMB 86685
                                                                                      Seattle, WA  98104-2205
                                                                                      Tel/Fax: 253-267-8530

particular drug or class was tested for and document a follow up plan based on the test results."
Washington State Health Care Authority, Washington Apple Health (Medicaid), Physician-Related
Services/Health Care Professional Services Billing Guide (Nov. 12, 2017). It further states that
"[s]erial quantitative monitoring of drugs or drug metabolite levels is not considered medically
necessary." *Id.*

50.    Montana and Iowa do not have Medicaid regulations or policies specifically
pertaining to urine drug testing.

**C.**    **Defendants' Urine Drug Testing Policy And Practices Result in Tests That**
**Are Not Medically Necessary Being Billed to Government Payors**

51.    Despite state and federal restrictions on the frequency of urine drug testing,
Defendants' policies and practices instruct providers to order more drug testing for patients than
medically necessary.

52.    Ideal Option's written urine drug testing policy for definitive testing states that
quantitative testing may not exceed one test per week for patients with zero to thirty days of
abstinence, one to three tests per month for patients with thirty-one to ninety days of abstinence,
and one to three tests every three months for patients with over ninety days of abstinence.

53.    In practice, however, Ideal Option's providers typically ordered urine drug testing
at each patient visit. New patients typically visit Ideal Option twice weekly at the beginning of
treatment. After the initial period when patients become more stabilized, patients usually visit
Ideal Option weekly, with some patients coming in once every two weeks.

54.    As a result, most patients receive one drug test per week, with even more testing
in the patient's initial treatment stage. This means that a typical patient will receive four tests
per month, or approximately forty-eight tests per year—far exceeding the limits set by states'
Medicaid agencies. For example, this frequency of testing far exceeds Alaska's limit of twenty
definitive drug tests per patient per year. Unless a patient's individual medical need requires
regular, frequent testing, such testing is not medically necessary.

1ST AM. COMPL. – QUI TAM ACTION          –15–          Robert McGuire Law Firm
No. 2:19-cv-00404-TSZ *SEALED*                                    113 Cherry Street PMB 86685
                                                                 Seattle, WA  98104-2205
                                                                 Tel/Fax: 253-267-8530

593162.1

55.     Had Defendants followed and enforced its written policy about the frequency of quantitative testing, patients would have received between four and forty-eight tests per year. Therefore, for many patients even Ideal Option's written policy—which in practice was not followed, as tests were performed at each visit—requires far more testing for most patients than states' Medicaid policies allow.

56.     Defendants also tests for an excessive number of drugs.  Ideal Option receives reimbursement from Medicaid and other insurance payors for both qualitative and quantitative tests.  Medicaid, Medicare, and other insurers typically reimburse per drug panel for qualitative testing, and per metabolite for definitive testing.  Therefore, the greater the number of metabolites analyzed in definitive testing, the greater reimbursement Ideal Option received.

57.     Defendants require that all new patients receive a "new patient" panel of drug tests.  The new patient panel tests for the metabolites of fifty-two drugs—an unreasonably large number of substances to test for at one time for a single patient.  For established patients, Ideal Option offers a preselected "safety panel" of tests, which tests for thirty-three metabolites. Neither the new patient or safety panel is customized to the specific patient and their medical history.  Ideal Option also offers other panels of testing, such as opiate or stimulant panels. Providers can also select whichever individual drug tests they would like to order for a specific patient.

58.     In Relator's experience, providers routinely used the preselected safety panel to test patients.  When she shadowed Dr. William Forsythe and Physician Assistant Chad Perry during her training, both providers only ordered safety panels for their patients.  Relator has also witnessed some providers using other panels built by Ideal Option.  She has not witnessed providers ordering tests based on individual patient histories and needs.

59.     Between December 19, 2018 and February 25, 2019, Ideal Option ran eight panels of qualitative drug tests on a patient insured by Medicaid of Alaska.  In particular, five tests were run in February alone.  Quantitative tests were also run on this patient frequently—

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–16–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

four tests were run in February, on four of the same dates as the screening panels were run. The patient's definitive tests typically included thirty-four metabolites—most of which the patient repeatedly tested negative for, indicating that it was not medically necessary to repeatedly perform tests because the patient was not abusing those drugs. Despite this, the patient continued to receive quantitative testing for those same metabolites, despite no evidence of abusing those drugs.

60. In another example, Ideal Option ran frequent, simultaneous qualitative and quantitative tests on a patient insured by United Healthcare (Medicare). In January 2019, the patient received definitive testing on five dates. In December 2018, the patient received definitive testing on six dates. For most of the metabolites Ideal Option tested, the patient repeatedly tested negative.

61. In other example, Ideal Option ran frequent qualitative and quantitative tests on another patient insured by Medicaid of Alaska. This patient received definitive testing on five dates in February 2019. In December 2018, this patient received definitive testing on six dates. In October 2018, this patient also received definitive testing on six dates. For almost all metabolites, the patient repeatedly tested negative.

62. Routinely performing both qualitative and quantitative levels of analysis for each metabolite, when the results of the patient's qualitative test show no need for further quantitative testing, is not medically necessary. If there is no indication from the qualitative test that the patient is using the drug, further quantitative testing to determine the level of drug in the patient's body is not necessary. For example, Alaska's Medicaid manual for Independent Laboratory Services specifies that definitive drug testing may only be ordered "to confirm a positive presumptive drug screening or when a negative result is inconclusive or inconsistent with clinical presentation." Alaska Medical Assistance, Provider Billing Manuals, Independent Laboratory Services (2016).

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–17–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA 98104-2205
Tel/Fax: 253-267-8530

593162.1

63.   Medicaid regulations provide that quantitative testing is only appropriate when the results of a patient's presumptive testing specifically show a need for quantitative testing and only for those specific drugs flagged by the presumptive testing. Blanket quantitative testing of all drugs for all patient samples is improper.

64.   Some of Ideal Option's locations perform in-office qualitative or presumptive testing by using a "dipstick" or cup method which tests for a limited and variable panel of a few substances. Other Ideal Option clinics that do not perform in-office presumptive testing, and those that only perform in-office dipstick testing, send out the samples to receive both qualitative and quantitative tests at Ideal Option's clinical laboratories located in the Tri-Cities area of Washington state.

65.   Ideal Option runs both qualitative and quantitative tests at the same time for samples sent to its Tri-Cities laboratories, despite that quantitative testing should only be performed *after* the results from qualitative testing are available to the provider and indicate a need for further testing. Conducting presumptive testing after a visit is concluded, when the results of the test cannot be used to inform further definitive testing, is duplicative and unnecessary, as it fails to inform whether further testing is needed. Performing both tests at once is duplicative and not appropriately reimbursed.

66.   Providers receive qualitative test results in two to three days, while quantitative test results take four to five days. Ideal Option does not wait for results from the qualitative test before ordering the more expensive and potentially unnecessary quantitative test. For patients who visit Ideal Option twice a week, patients may return to the office and receive another urine drug test without their provider having even received the results of the previous test at that point.

67.   By testing patients more frequently than necessary, ordering numerous UDTs for all patients regardless of patients' individual needs, and running qualitative and quantitative testing simultaneously at its laboratories, Ideal Option submits or causes the submission of false

1ST AM. COMPL. – QUI TAM ACTION                    –18–          ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                                      113 Cherry Street PMB 86685
                                                                   Seattle, WA  98104-2205
                                                                   Tel/Fax: 253-267-8530

593162.1

claims to government payors including Medicaid and Medicare.  Ideal Option billed government insurers including states' Medicaid programs to obtain reimbursement for duplicative and unnecessary tests.

### 1.     Defendants Perform Other Unnecessary Clinical Tests and Submits Claims for Reimbursement to Government Payors

68.     Ideal Option performs other medically unnecessary tests on patients as well.  Ideal Option tests patients' thyroid function via free T4 and TSH tests, and also tests for syphilis, complete blood counts, basic metabolic function, hepatitis A, B, and C, and HIV.  Until November 2018, Ideal Option also automatically performed pregnancy tests on all new female patients.

69.     Ideal Option does not treat these conditions and will, at the most, tell patients with abnormal test results to consult a general practitioner or endocrinologist.  However, Ideal Option does not even provide patients with referrals to outside providers and, at most, will simply verbally tell patients to follow up with their general practitioner or another doctor.

70.     Medicare regulations require that diagnostic tests "must be ordered by . . . the physician who furnishes a consultation or *treats a beneficiary for a specific medical problem* and who *uses the results in the management of the beneficiary's specific medical problem*."  42 C.F.R. § 410.32(a) (emphasis added).  Ideal Option providers do not treat their patients for the conditions these tests reveal, and do not use the test results for any other purpose.

71.     In one instance on September 21, 2018, Relator acted as the prescribing provider for a patient seen via telemedicine in one of Ideal Option's Washington state offices.  Relator ordered a hepatic function test for the patient to determine if the patient could safely take prescribed medications.  However, the telemedicine medical assistant—an unlicensed provider—also ordered tests for a complete blood count, syphilis, and HIV, without consulting or notifying Relator.  When Relator requested those orders be removed, the medical assistant said she could not remove them and that the orders had already been transmitted.  Relator

therefore had to contact the laboratory to cancel the unnecessary and unrequested orders placed by the medical assistant, for medical issues that Ideal Option does not treat.

72.     By ordering laboratory tests for conditions Ideal Option does not treat and for which in some cases treating providers did not request to be performed, Ideal Option submits or causes the submission of false claims to government payors including Medicaid and Medicare. The fact that the United States and States paid reimbursement for false and fraudulent claims to Ideal Option subsequent to the filing of this action does not negate the materiality of the Defendants' conduct. The Government has no practical means of discerning, upon receipt of claims for reimbursement, which tests were appropriate and which were not medically necessary.

## VII.   DEFENDANTS CAUSED CONTROLLED SUBSTANCES TO BE DISPENSED WITHOUT VALID PRESCRIPTIONS, IN VIOLATION OF THE CONTROLLED SUBSTANCES ACT

### A.     The Controlled Substances Act Requires a Valid Prescription to Dispense Buprenorphine

73.     Defendants primarily treat opioid addiction by prescribing buprenorphine (brand name Suboxone). Although buprenorphine is itself an opioid, it is a partial opioid agonist, which means that it behaves differently than other opioids. It produces less of the rewarding "euphoria" of pure opioids such as heroin and morphine, poses less risk of overdose, and can decrease the craving for opioids and stave off or suppress the effects of opioid withdrawal.

74.     The Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA"), restricts who can manufacture, distribute, and provide controlled substances, including buprenorphine, which is a Schedule III drug. Schedule III drugs are those drugs where "[a]buse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence." 21 U.S.C. § 812(b)(3).

75.     Traditionally, providing controlled substances to treat opioid dependence could only be done by practitioners and Opioid Treatment Programs (typically known as methadone

1ST AM. COMPL. – QUI TAM ACTION                    –20–                    ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                                          113 Cherry Street PMB 86685
                                                                        Seattle, WA  98104-2205
                                                                        Tel/Fax: 253-267-8530

593162.1

maintenance treatment programs or "OTPs") licensed and registered under the CSA.  21 U.S.C. § 823(g)(1).

76.     However, the need for substance abuse care necessitated changes to that system and in 2000 Congress amended the CSA via the Drug Addiction Treatment Act of 2000, Pub. L. No. 106-310, 113 Stat. 1101 (2000) ("DATA 2000").  DATA 2000 made possible the dispensation of certain controlled substances possible in an office-based outpatient care setting, known as Office Based Opioid Treatment ("OBOT"), by providers who could waive the licensing requirement.

77.     The DEA waiver system implemented by DATA 2000 allowed qualified providers (physicians, nurse practitioners, and physician assistants) that meet certain standards to waive the requirement to obtain a DEA license and registration as a methadone clinic to prescribe controlled substances to treat opioid dependence.  21 U.S.C. § 823(g)(2)(A).  The waiver permits the provider to treat only a limited number of patients.  21 U.S.C. § 823(g)(2)(B)(iii) (30 to 275 patients).  The practitioner must certify to the Secretary of Health and Human Services that "The total number of such patients of the practitioner at any one time will not exceed the applicable number."  21 U.S.C. § 823(g)(2)(B)(iii)(I).

78.     If the provider no longer satisfies the requirements of the waiver, or violates Section 824(a) of the CSA, the Substance Abuse and Mental Health Services Administration (an agency of the Department of Health and Human Services) can revoke or suspend the waiver.  42 C.F.R. § 8.650(a).  Section 824(a) also provides that the Attorney General may suspend or revoke registrations to dispense a controlled substance under certain circumstances, including when the provider commits acts that "would render his registration under section 823 of this title inconsistent with the public interest as determined under such section."  21 U.S.C. § 824(a)(4).  Violating the waiver conditions may be considered by the Attorney General to be an act that renders the registration of the practitioner inconsistent with the public interest.  21 U.S.C.A. § 823(g)(2)(E)(i).

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

79.     The CSA makes it unlawful for any person subject to the registration requirements, including waived providers, to distribute or dispense a Schedule III controlled substance without a valid prescription, as described by Section 503(b) of the Food, Drug, and Cosmetic Act.  42 U.S.C. §§ 842(a)(1); 829(b).  Section 503(b) of the Act states that prescriptions for drugs shall only be "dispensed only upon a written prescription of a practitioner licensed by law to administer such drug."  21 U.S.C.A. § 353(b)(1).  The CSA also provides that prescriptions for controlled substances may only be issued by "an individual practitioner who is . . . registered or exempted from registration pursuant to [the CSA regulations]."  21 C.F.R. § 1306.3.  The CSA regulations further clarify that "[a] prescription may not be issued for 'detoxification treatment' or 'maintenance treatment,' unless . . . the practitioner *is in compliance with requirements in §1301.28 [the waiver requirement]* of this chapter."  21 C.F.R. § 1306.04(c).

80.     In addition to requiring providers to be in compliance with the registration requirements under the DEA for prescriptions to be valid, "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. . . . An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829)."  21 C.F.R. § 1306.04(a).  The DEA Practitioner's Manual notes that one of the recurring patterns that may be indicative of prescribing outside of the "usual course of professional practice" includes when "[n]o physical examination was given."  U.S. Drug Enforcement Administration, U.S. Dep't of Justice, Practitioner's Manual: An Informational Outline of the Controlled Substances Act 30 (2006 Ed.) *available at* https://www.deadiversion.usdoj.gov/pubs/manuals/pract/pract_manual012508.pdf.

593162.1

81.     Defendants abuse the waiver system by requiring providers to issue buprenorphine prescriptions under their names and NPI numbers, for patients the provider did not examine or determine medication for, but whom are assigned to their waivers.

82.     Defendants use this system as window dressing engineered to make its providers appear as though they are legitimately issuing prescriptions for patients in compliance with the waiver system.   Its policy also knowingly requires its providers to, in substance, prescribe controlled substances for many more patients than permitted by providers' waivers.

**B.      Defendants Cause Its Providers to Issue Invalid Prescriptions for Dispensation of Controlled Substances**

83.     Ideal Option's policy requires its providers to issue prescriptions for buprenorphine for patients they have not personally examined and without a way for providers to realistically alter the prescriptions issued by others under their DEA waivers.

84.     Under Defendants' policy, a provider conducts the patient exam, writes the chart notes, and creates a treatment plan, including determining any prescriptions and laboratory orders.   At the end of each day, this provider sends the chart to the provider holding the DEA waiver that patient is assigned to (the "prescribing provider").

85.     That same day, Ideal Option requires the prescribing provider to sign off on the treatment plan from the provider who examined the patient, including the prescription determined by the provider who saw the patient.   The prescribing provider must do so even though he or she never actually examined that patient and did not determine their medication regime.   The prescription is then issued under the name and NPI number of the provider to whose waiver the patient is assigned.

86.     Defendants thus require that providers issue prescriptions for patients assigned to their DEA waivers, even though they were not examined, nor had their medication needs determined, by the prescribing provider.

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*                    –23–                    ROBERT MCGUIRE LAW FIRM
                                                                         113 Cherry Street PMB 86685
                                                                         Seattle, WA  98104-2205
                                                                         Tel/Fax: 253-267-8530

593162.1

87.     In addition, Ideal Option's prescribing providers are precluded from altering the prescriptions issued under their waivers.  The patient's chart notes are already locked for editing when the prescribing provider receives it from the treating provider.  Consequently, the prescribing provider cannot enter changes to the treatment plan, lab orders, or prescriptions entered by the treating provider.  The prescribing provider has no input, even though that patient is assigned to their waiver and their name appears on the prescription.

88.     If the prescribing provider to whom that patient is assigned disagrees with a prescription, they must request a change by creating an addendum to the chart and contacting the Nurse Care Team.  The Nurse Care Team is responsible for relaying the change in treatment plan and/or prescription to the patient, the pharmacy team responsible for relaying the prescription to the pharmacy, and the treating provider.  There is no way for prescribing providers to change a prescription other than by contacting the Nurse Care Team.

89.     It is extremely difficult for providers to control the prescriptions written for the patients assigned to their waiver by Ideal Option.  Relator's addendums to treatment plans have been overridden numerous times by other providers, even though Relator's name appears on the prescriptions and those patients are assigned to her waiver.  Thus, Ideal Option's policy forces providers to issue prescriptions that they may not agree with and have no realistic opportunity to modify.

90.     For example, on August 27, 2018 Relator attempted to change the treatment plan of a patient who was assigned to her waiver, but whom she did not examine.  The patient was taking buprenorphine but had tested positive for alcohol use.  Taking buprenorphine and alcohol together can be dangerous, but the provider who examined the patient had not addressed the issue and continued to prescribe the patient buprenorphine.  Relator added an addendum to the patient's treatment plan and had to call the pharmacy to stop it from filling the buprenorphine prescription.  Despite this, the provider that examined the patient ignored Relator's changes—

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–24–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

despite the fact that the patient was assigned to Relator's waiver and prescriptions were issued under Relator's name and DEA waiver.

91.     In another instance, a provider created an unsafe treatment plan for a patient assigned to Relator's waiver. The prescription was issued under Relator's name, per Defendants' policy. Relator had to send numerous emails and call the pharmacy to stop the ordered prescription from being dispensed.

92.     In another instance, Relator was asked to sign off as the prescribing provider on a treatment plan, including medication, for a patient that Relator only met with over an approximately thirty seconds video chat.

93.     Ideal Option provides telemedicine appointments, so providers may sometimes see patients in other locations through video chat. For these visits, a licensed clinical provider connects via video chat with a medical assistant or other practitioner who is physically present with a patient in another office location. The patient is "introduced" to the remote provider via video chat in an interaction that takes approximately one minute and does not involve any substantive medical care. The remote provider connected via video chat is expected to issue prescriptions under their DEA waiver for medication regimes that are actually determined by the provider physically present with this patient.

94.     When Relator told Dr. Allgaier that she did not feel comfortable issuing prescriptions for patients from other states that she did not substantively treat, Dr. Allgaier responded that all providers at Ideal Option must accept patients from other states, and that if she did not feel comfortable doing so, it was not the right job for her.

95.     Ideal Option does not give providers a way to view a list of patients assigned to their waiver. It assigns patients to providers' waivers and removes them from waiver lists without notifying or consulting the provider. Ideal Option's Electronic Medical Record system does not have a reliable way for providers to see how many patients, or which patients, are

593162.1

assigned to their waivers. The criteria for inclusion on a waiver list are not disclosed to providers and the lists do not always seem to be accurate.

96.     Relator asked Alysha McElwain, who manages assigning patients to providers' waivers, which patients Ideal Option had assigned to her waiver and how patients are assigned and removed from the list. McElwain failed to respond to Relator's emailed inquiry.

97.     By using these policies and practices, Defendants forces providers to appear to be prescribing controlled substances in accordance with the waiver system, when in substance providers are unable to examine patients and determine the prescriptions for the patients assigned to them and for which they issue prescriptions. Its policies prevent the prescribing provider from having any meaningful prescribing power for the patients assigned to their waiver.

98.     Ideal Option uses this system because it is convenient for the company to be able to have any provider working on a given day see any patient that presents for a visit that day, regardless of whether that patient is assigned to the waiver of that provider. Consequently, Ideal Option randomly assigns patients to the waiver of any provider with available space on their waiver, and has them issue prescriptions for those patients regardless of whether the provider actually examines and treats those patients.

99.     Dr. Jeffrey Algaier and Dr. Egli, Ideal Option's founders, also hold waivers to which Ideal Option has assigned patients. However, Dr. Algaier and Dr. Egli do not personally see or treat patients at all. Other providers treat the patients assigned to their waivers, and the doctors merely issue prescriptions without determining if those prescriptions are appropriate.

100.    For example, as of January 16, 2019, Dr. Egli had 268 patients assigned to his waiver, yet he does not see any patients personally on a regular basis. Those 268 patients are being seen by other providers throughout Ideal Option's clinics. This is also true of Dr. Brian Dawson, who on that same date had approximately 261 patients assigned to his waiver, but who only sees patients on an occasional basis.

1ST AM. COMPL. – QUI TAM ACTION                    –26–                ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                                        113 Cherry Street PMB 86685
                                                                     Seattle, WA  98104-2205
                                                                     Tel/Fax: 253-267-8530

101.    In at least one instance, Ideal Option employed a provider, Annette McClendon, who did not hold a waiver at all for some period of time. Dr. Egli and Dr. Allgaier co-signed Ms. McClendon's treatment notes and issued the prescriptions in their own names, despite not actually examining or creating treatment plans for her patients.

102.    In addition, due to this system Ideal Option's providers end up examining and determining prescriptions for a far greater number of patients than allowed by their waivers.

103.    A provider may examine and in substance determine the prescription for many more patients than permitted by their waiver. This occurs because providers examine any patients presenting for a visit during their shift regardless of whether that patient is assigned to their waiver. Thus, a provider may examine and determine prescriptions for fifty patients who present for visits in a week, when their waiver only allows them to prescribe to thirty patients. But because the provider examining the patient and determining the patient's dosage, refills, and medications is not the provider under whose name the prescription is issued, Ideal Option makes it appear to adhere to the patient limits of its providers' waivers. Meanwhile, providers craft medication plans for any patients scheduled for a visit during their shift—a far greater number of patients, and different patients, than those assigned by Ideal Option to their waivers.

104.    Through these policies and practices, Defendants knowingly causes its providers to issue prescriptions that are not valid under the CSA and for which it is reasonably foreseeable would cause the subsequent dispensation of controlled substances in violation of the CSA, and for which Medicaid and Medicare reimburse.

## VIII.    CAUSES OF ACTION

**Count I**

**False Claims Act**

**31 U.S.C. §§ 3729(a)(1)(A)-(B)**

105.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

106.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

107.    Defendants have knowingly have caused the presentation of false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

108.    Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

109.    The United States Government, unaware of the falsity of the claims that Defendants caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

110.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

111.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### Count II

### Alaska Medical Assistance False Claim and Reporting Act

### Alaska Stat. Ann. §§ 09.58.010-110

112.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

113.    This is a claim for treble damages and penalties under the Alaska Medical Assistance False Claim and Reporting Act.

114.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Alaska state government for payment or approval.

115.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Alaska state government.

116.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Alaska state government to approve and pay such false and fraudulent claims.

117.    The Alaska state government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

118.    Defendants have damaged, and continues to damage, the state of Alaska in a substantial amount to be determined at trial.

119.    Additionally, the Alaska state government is entitled to the maximum penalty for each and every violation alleged herein.

### Count III

### Iowa False Claims Act

### Iowa Code §§ 685.1-.7

120.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

121.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

122.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Iowa state government for payment or approval.

123.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Iowa state government.

124.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa state government to approve and pay such false and fraudulent claims.

125.    The Iowa state government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

1ST AM. COMPL. – QUI TAM ACTION          –29–          ROBERT MCGUIRE LAW FIRM
No. 2:19-cv-00404-TSZ *SEALED*                              113 Cherry Street PMB 86685
                                                            Seattle, WA  98104-2205
                                                            Tel/Fax: 253-267-8530

593162.1

126.    Defendants have damaged, and continues to damage, the state of Iowa in a substantial amount to be determined at trial.

127.    Additionally, the Iowa state government is entitled to the maximum penalty for each and every violation alleged herein.

### Count IV

### Maryland False Health Claims Act

### Md. Health Gen. Code §§ 2-601-2-611

128.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

129.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

130.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Maryland state government for payment or approval.

131.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Maryland state government.

132.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland state government to approve and pay such false and fraudulent claims.

133.    The Maryland state government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

134.    Defendants have damaged, and continues to damage, the State of Maryland in a substantial amount to be determined at trial.

135.    Additionally, the Maryland state government is entitled to the maximum penalty for each and every violation alleged herein.

### Count V

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

**Minnesota False Claims Act**

**Minn. Stat. § 15C.01**

136.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

137.   This is a claim for treble damages and penalties under the Minnesota False Claims Act.

138.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Minnesota state government for payment or approval.

139.   By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Minnesota state government.

140.   Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota state government to approve and pay such false and fraudulent claims.

141.   The Minnesota state government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

142.   Defendants have damaged, and continues to damage, the state of Minnesota in a substantial amount to be determined at trial.

143.   Additionally, the Minnesota state government is entitled to the maximum penalty for each and every violation alleged herein.

**Count VI**

**Montana False Claims Act**

**Mont. Code Ann. §§ 17-8-401 - 416**

144.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–31–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

145. This is a claim for treble damages and penalties under the Montana False Claims Act.

146. Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Montana state government for payment or approval.

147. By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Montana state government.

148. Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana state government to approve and pay such false and fraudulent claims.

149. The Montana state government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

150. Defendants have damaged, and continues to damage, the state of Montana in a substantial amount to be determined at trial.

151. Additionally, the Montana state government is entitled to the maximum penalty for each and every violation alleged herein.

### Count VII

### Washington Medicaid Fraud False Claims Act

### (RCW) §§ 74.66.005-130

152. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

153. This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act.

154. Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Washington state government for payment or approval.

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–32–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

155.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Washington state government.

156.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington state government to approve and pay such false and fraudulent claims.

157.    The Washington state government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

158.    Defendants have damaged, and continues to damage, the state of Washington in a substantial amount to be determined at trial.

159.    Additionally, the Washington state government is entitled to the maximum penalty for each and every violation alleged herein.

A.    **PRAYER**

WHEREFORE, Relator prays for judgment against Defendants as follows:

160.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*. and the analogous state false claims laws of the Plaintiff-States of Alaska, Iowa, Maryland, Minnesota, Montana, and Washington;

161.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the Plaintiff-States have sustained because of Defendants' actions, plus the maximum civil penalty permitted for each violation of the Federal False Claims Act and of the analogous state false claims laws of the Plaintiff-States;

162.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and of the *qui tam* provisions of the analogous state false claims laws of the Plaintiff-States;

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–33–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

163. That Relator be awarded all fees, costs, and expenses incurred in connection with this action, including attorneys' fees, costs, and expenses; and

164. That Relator recovers such other relief as the Court deems just and proper.

**B.    DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted this 22nd day of April, 2019.

By: _s/ Erika Kelton_
Erika Kelton
E-mail:   ekelton@phillipsandcohen.com
Emily Stabile
E-mail:   estabile@phillipsandcohen.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000
Fax: (415) 836-9001

*Attorneys for Relator Karen Rawlins*

By: _Robert A. McGuire_
Robert A. McGuire, III, WSBA #50649
ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA 98104-2205
Telephone: (253) 267-8530
Fax: (253) 267-8530
E-mail:   ram@lawram.com

*Attorney & Local Counsel for Relator Karen Rawlins*

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–34–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1

1

2

**CERTIFICATE OF SERVICE**

On this 22nd day of April, 2019, pursuant to Court rules applicable to filing in sealed cases,

3

4

I filed the foregoing with the Clerk of the Court in person, and I mailed a copy of the same by first-

class U.S. Postal Service to the following persons in a sealed case without CM-ECF access and/or

5

non-CM/ECF participants:

6

NONE. (Not served on Defendants while under seal

7

pursuant to 31 U.S.C. § 3730(b)(2).)

8

I certify under penalty of perjury under the laws of the State of Washington that the foregoing

9

is true and correct.  Executed at Gig Harbor, Washington this 22nd day of April, 2019.

10

11

12

_Robert A. McGuire_

13

Robert A. McGuire, III, WSBA #50649

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1ST AM. COMPL. – QUI TAM ACTION
No. 2:19-cv-00404-TSZ *SEALED*

–35–

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel/Fax: 253-267-8530

593162.1